**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANDY HOPE WILLIAMS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 CV 2549 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THE CITY OF AURORA, OFFICER | ) | |
| BADGE #390, OFFICER BADGE | ) | |
| #392, MAYOR RICHARD IRVIN AND | ) | |
| CITY COUNCIL OF AURORA, | ) | |
| KRISTEN ZIMAN in her individual | ) | |
| capacity, SERGEANT TATE, OFFICER | ) | |
| MATTHEW HUBER, OFFICER | ) | |
| TIMOTHY YOUNG, OFFICER | ) | |
| STEVEN MARTIN, and OFFICER | ) | |
| ANTONIO PISCOPO in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andy Hope Williams, Jr., proceeding *pro se* and *in forma pauperis*, has brought suit based on an August 2019 traffic stop. In a second case (Case No. 21 C 3489), he brought suit based at least in part on the same traffic stop and asserting violations of federal and state law related to a gang database allegedly maintained by the City of Aurora and the City's handling of an Illinois Freedom of Information Act ("Illinois FOIA") request. The second case was reassigned to the Court as related to this case. The Court then granted Mr. Williams leave to file an amended consolidated complaint comprising his claims in this case and in the second case. On December 24, 2023, Mr. Williams filed a motion for leave to file an amended complaint, attaching his proposed amended consolidated complaint ("ACC"). ECF No. 105. In addition to consolidating the claims previously filed in this case and in the second case, he seeks to add new claims and defendants. Screening the proposed ACC pursuant to 28 U.S.C. § 1915(e)(2), the Court finds that

all claims in the ACC warrant dismissal. Accordingly, Mr. Williams' motion for leave to amend his complaint is granted and the ACC is dismissed.

## BACKGROUND[1]

Mr. Williams is a Black man who resides in Illinois. ACC 6, Ex. A to ECF No. 105.[2] His claims stem principally from an August 27, 2019, traffic stop in Aurora, Illinois. Mr. Williams alleges that four Aurora Police Department ("APD") officers stopped him near the intersection of Claim and High Streets and detained him for over an hour. Mr. Williams stopped driving in response to flashing lights coming from a police car behind him. Two officers, Timothy Young and Matthew Huber, then approached Mr. Williams' car, Officer Young on the driver's side and Officer Huber on the passenger side. After rolling down his window, Mr. Williams asked Officer Young to explain the reason for the stop. Officer Young responded, "late turn signal and rolled stop sign." *Id*. at 28. He then asked Mr. Williams about Mr. Williams' itinerary, explaining that he believed he had seen Mr. Williams emerge from the driveway of a house that had been involved in recent shootings and robberies. Mr. Williams denies that he committed traffic violations and alleges that he was travelling directly from a meeting at East Aurora High School when he was stopped.

During the stop, Officer Huber stayed on the passenger side of the car. At some point, Mr. Williams noticed Officer Huber "star[ing]" at him and leaning on the passenger-side window and door. *Id*. at 30. This agitated Mr. Williams, who "yell[ed]" at Officer Huber to get off the side of

---

[1] Background facts related to the stop, subsequent state-court proceedings, and an Illinois FOIA request are drawn from the proposed ACC. Background facts related to the federal litigation history are drawn from the proceedings before this Court and the docket in Case No. 21 C 3489. Where background facts are drawn from outside the proposed ACC, they are cited as such.

[2] In citing to the ACC, the Court uses page numbers rather than paragraph numbers because the complaint skips some paragraph numbers and duplicates others.

the car. *Id*. Officer Huber refused, and Mr. Williams repeated his request. Officer Young then intervened. He explained to Mr. Williams that Officer Huber was present by the car to ensure the other officers' safety, and he added that Mr. Williams was detained. Mr. Williams contested the lawfulness of the detention. Officer Young responded by saying that Mr. Williams was "lawfully detained," was "on a traffic stop," and did "not have the right to travel." *Id*. at 31. Throughout the stop, Officers Andrew Martin and Antonio Piscopo remained in the police car.

At the end of the stop, Officer Young handed Mr. Williams two traffic citations, one for failure to signal 100 feet before turning and one for disobeying a stop sign. The tickets were signed by Officers Young and Piscopo. Mr. Williams initially refused to sign the tickets or to promise to comply with their terms. However, he relented after the officers told him that he needed to sign the tickets and threatened him with a warrant if he did to comply with their terms.

In the aftermath of the traffic stop, Mr. Williams initially approached the APD and the City of Aurora's Mayor with grievances related to the traffic stop. On the same day as the stop, Mr. Williams drove to the APD, where he complained to Sergeant Jeff Tate, who was on duty, about the traffic stop. Sergeant Tate expressed sympathy, but he neither dropped the traffic citations nor allowed Mr. Williams to file a complaint against the officers. Before leaving the APD, Mr. Williams proposed a meeting to "have a dialogue about better policing in the community." *Id*. at 32. Sergeant Tate did not follow up. The next day, August 28, 2019, Mr. Williams texted City of Aurora Mayor Richard Irvin, "explaining the incident and ask[ing] if the City of Aurora would be interested in an implicit bias training and if the city had a plan in place for the oppressed people." *Id*. at 33. Mayor Irvin never responded to the text message.

About a week later, on September 4, 2019, the State of Illinois brought charges against Mr. Williams in the Sixteenth Judicial Circuit Court in Kane County for failure to signal 100 feet before

turning, in violation of 625 ILCS 5/11-804(b), and for disobeying a stop sign, in violation of 625 ILCS 5/11-1204(b). *People of Illinois v. Williams*, Case Nos. 19 TR 42043-44.

During the discovery phase of the state-court proceedings, Mr. Williams obtained copies of GPS data, the squad camera video, and the computer-aided dispatch ("CAD") report for the traffic stop. He obtained an initial copy of the squad camera video from a state's attorney in open court. Kane County employee Dawn Miller certified that this copy of the video was true and correct. Mr. Williams obtained the other discovery (and a second copy of the squad camera video) using a subpoena to the City of Aurora and over the objection of City of Aurora's Attorney Deborah Lang, who filed a motion to quash the subpoena.

While discovery in the state-court case was ongoing, Mr. Williams also sought documents from the City of Aurora regarding any Aurora gang databases.[3] On January 1, 2020, Mr. Williams sent a public records request to the City of Aurora under the Illinois FOIA, 5 ILCS 140/1, for documents regarding any Aurora gang databases. After discussions about narrowing the request, the City of Aurora ultimately denied Mr. Williams' request in full on January 23, 2020, citing two Illinois FOIA exemptions pertaining to law enforcement records: §§ 7(1)(d)(i), (v)-(vi) and 7(1)(b-5). Mr. Williams then sought help obtaining the documents from a public access counselor pursuant to Illinois FOIA § 9.5(g), but the City persisted in its position that the documents were exempt. After this response from the City, Mr. Williams requested that the public access counselor close his file, and, on May 20, 2020, the counselor complied with Mr. Williams' request.

Prior to trial, Mr. Williams also filed several unsuccessful motions, petitions, demands, and requests before the state court: a motion to quash and suppress the traffic citations for constitutional

---

[3] The Court is unsure whether he sought these documents in connection with his state-court proceedings or for another reason. However, the answer does not affect the Court's analysis.

4

violations on April 9, 2021 (denied by Judge Bianca Camargo on August 18, 2021, at a hearing where State's Attorney Heena Patel represented the State of Illinois); a motion to dismiss for constitutional violations on August 27, 2021 (denied by Judge Camargo on October 7, 2021); a motion to recuse for cause citing bias by Judge Bianca Camargo on October 18, 2021 (denied by Judge Camargo on October 20, 2021); a petition to reconsider the denial of the motion to recuse on November 2, 2021 (denied by Judge Rene Cruz on December 29, 2021); a motion to compel discovery on February 28, 2023 (denied by Judge Kimberly DiGiovanni on April 20, 2023); a request for a court reporter on March 16, 2023 (denied by Judge DiGiovanni on March 30, 2023); and a petition to dismiss on April 13, 2023 (struck by Judge DiGiovanni on April 20, 2023, upon the motion of State's Attorney Eric F. Walliser).

Mr. Williams' April 13, 2023, petition to dismiss is included as an attachment to the ACC. Verified Pet. to Dismiss, ACC Ex. 1. In this petition, Mr. Williams argued that his traffic tickets should be dismissed for two reasons. First, he argued that the tickets should be dismissed for "fraud upon the court." *Id*. at ¶ 10. In support of this argument, Mr. Williams alleged that the squad camera video he received "did not accurately show the full version of the August 27, 2019[,] traffic stop." *Id*. at ¶ 10. Mr. Williams alleged that state's attorneys had conspired with Officer Young and the APD to "deprive the accused of a right to a fair trial and right to due process" by providing him with an edited video. *Id*. at ¶ 10. Second, Mr. Williams argued that the case should be dismissed because the stop constituted an unreasonable seizure under the Fourth Amendment. He argued that the stop was unreasonable because the officers' stated bases for the stop, failure to signal and disobeying a stop sign, were pretexts to obtain evidence about gang-related crimes. Mr. Williams complained that Officer Young had asked him questions unrelated to traffic violations,

such as "where are you coming from?" *Id*. at ¶ 12. As noted above, these arguments did not prevail; Judge DiGiovanni struck Mr. Williams' petition.

The state-court case proceeded to a bench trial before Judge DiGiovanni on May 25, 2023. The evidence introduced at trial comprised the testimony of Officers Young and Piscopo and the CAD report. State's Attorney Walliser conducted the direct examinations of both officers, and Mr. Williams cross examined them. At the close of trial, Judge DiGiovanni found Mr. Williams guilty of failure to signal and not guilty of disobeying a stop sign. On May 31, 2023, Kane County Clerk Theresa Barreiro sent Mr. Williams a notice of financial obligations indicating that he owed a fine of $287.50. As far as the Court is aware, Mr. Williams has yet to pay this fine. He indicates in the ACC that he has received two further notices of financial obligation and that Judge Marina Lark Cowart entered an order sending his case to collections.

After trial, Mr. Williams filed two more unsuccessful motions in the Sixteenth Judicial Circuit Court: a motion to vacate the judgment for fraud upon the court, due process violations, and lack of jurisdiction on June 26, 2023 (denied by Judge Cowart on July 7, 2023); and a motion to clarify his motion to vacate on August 4, 2023 (denied by Judge Cowart on August 10, 2023). Mr. Williams' time to appeal his conviction to the state appellate court expired without the filing a notice of decision to appeal.

On April 27, 2020, while the state-court proceedings were ongoing, Mr. Williams brought his traffic-stop grievances to this Court. He filed this case, Case No. 20 C 2549, alleging claims against the City of Aurora, the APD, Chief Ziman, and the four responding officers. His claims were based on the August 2019 traffic stop and a purported Auora gang database. In the original complaint, Mr. Williams connected the traffic stop to the gang database, alleging that he would not have been "targeted and detained for an hour" but for the inclusion of his name in the gang

database. Compl. ¶ 15, ECF No. 2. The City of Aurora and Chief Ziman filed a partial motion to dismiss on August 4, 2020. ECF No. 24. Mr. Williams failed to respond, and the Court granted the motion. Order, Sept. 10, 2020, ECF No. 28. In its Order, the Court struck Chief Ziman and the APD as defendants and dismissed three counts without prejudice.

On November 17, 2020, Mr. Williams filed an amended complaint. ECF No. 38. In his first amended complaint, he made several changes to the lineup of defendants: he named the four responding APD officers, Officers Huber, Young, Martin, and Piscopo; he added Chief of Police Kristen Ziman as a defendant in her individual instead of official capacity; and he added three new defendants, Mayor Irvin, the City Council of Aurora, and Sergeant Tate. Mr. Williams did not replead allegations regarding the gang database (the first amended complaint omitted any factual allegations concerning the gang database, as well as the original count based on the gang database, Count IX, which had been dismissed). On December 7, 2020, the defendants filed another partial motion to dismiss. ECF No. 43. Mr. Williams again failed to respond, and the Court again granted the motion. *Williams v. City of Aurora* ("*Williams I*"), No. 20 C 02549, 2021 WL 428829, at *2 (N.D. Ill. Feb. 8, 2021). After the Court's Order, the only claims still pending in this case were Mr. Williams' claims against the four responding officers based on the traffic stop. *Id*. The Court dismissed all other claims with prejudice. *Id*. The remaining parties agreed to stay the case pending resolution of the state-court proceedings against Mr. Williams. ECF Nos. 77-78.[4]

On July 30, 2021, Mr. Williams filed a separate lawsuit alleging claims against the City of Aurora, Chief Ziman, and Sergeant Tate based on the Aurora gang database and his denied Illinois FOIA request (the "Second Case"). *See Williams v. City of Aurora* ("*Williams II*"), No. 21 C 3489,

---

[4] Neither Mr. Williams nor the defendants sought to stay this case pending resolution of the state criminal case until the defendants moved for a stay on July 2, 2021. ECF No. 65.

2022 WL 2867095, at *1 (N.D. Ill. July 21, 2022).[5] The Second Case was initially assigned to Judge Ronald A. Guzmán. In their motion to dismiss briefing, the defendants disclosed that Mr. Williams had previously brought claims based on the gang database. Defs.' Mem. Supp. Mot. Dismiss Pl.'s 1st Am. Compl. 4, ECF No. 37. Judge Guzmán concluded that this case (*i.e.*, Case No. 20 C 2549) and the Second Case grew out of the same transaction or occurrence, Mr. Williams' "purported inclusion in the Aurora gang database and the subsequent traffic stop." *Williams II*, 2022 WL 2867095, at *2. Because of this overlap, Judge Guzmán requested that the Executive Committee reassign the Second Case to this Court as related to Case No. 20 C 2549 pursuant to Local Rule 40.4. *Id*. at *4.

The Executive Committee reassigned the Second Case to this Court on July 29, 2022. As in this case, the Court stayed the Second Case pending resolution of the state-court proceedings against Mr. Williams. In anticipation of granting Mr. Williams leave to file an amended consolidated complaint comprising the claims in both cases, the Court dismissed the pending motions to dismiss in both cases without prejudice. On October 2, 2023, after the parties advised

---

[5] On June 15, 2021, between filing this case and the Second Case, the plaintiff also filed a case against the City of Aurora, Mayor Irvin, the Aurora City Council, the Association of Professional Police Officers, Lee Catavu, and Sergeant Tate, alleging that the defendants use racially discriminatory policing practices against certain minority residents of the City of Aurora. *Williams v. City of Aurora*, No. 21 C 3212, Compl. ¶ 3, ECF No. 1. Mr. Williams alleged that the City of Aurora "has a long history of racial inequality and prejudice in its criminal justice system generally, and within its police force particularly" and asked for "injunctive relief and damages in the amount of 10% of the APD budget that will enable the City to eliminate unconstitutional conduct that has plagued APD for decades." *Id*. at ¶¶ 7, 9. These allegations resemble some of the allegations in Mr. Williams' complaints in this case and the Second Case, although he did not rely on the August 2019 traffic stop to show standing; rather, he asserted that he had standing as a "Private Attorney General" on behalf of the City of Aurora's residents. *Id*. at ¶ 1. Judge John F. Kness dismissed Case No. 21 C 3212 for lack of standing, finding that Mr. Williams "ha[d] not alleged a past or likely-to-occur future injury." Order 3, March 9, 2023, ECF No. 38.

the Court that Mr. Williams' state-court proceedings had been resolved, the Court lifted the stay and granted Mr. Williams leave to file an amended consolidated complaint. ECF No. 96.

On December 24, 2023, Mr. Williams filed a motion for leave to "file an Amended Complaint to include additional Defendants and cure deficiencies." Pl.'s Mot. 1, ECF No. 105. He attached his proposed amended complaint, the ACC. The ACC asserts claims against twenty-five defendants. These include the remaining four defendants in this case (Officers Young, Huber, Martin, and Piscopo), the defendants named in the Second Case (the City of Aurora, Chief of Police Keith Cross,[6] and Sergeant Tate), and eighteen new defendants. In addition to adding new defendants, the ACC adds factual allegations regarding the state-court proceedings and new legal theories (the ACC identifies twenty-two counts).

The complete list of defendants in the proposed ACC is:

- State of Illinois

- Governor of Illinois J.B. Pritzker

- Secretary of State of Illinois Alexander Giannoulias

- Attorney General of Illinois Kwame Raoul

- Kane County

- Kane County Clerk Theresa Barreiro

- Sixteenth Judicial Circuit Court Judges Thomas Clinton Hull III, Rene Cruz, Bianca Camargo, Kimberly DiGiovanni, and Marina Lark Cowart

- Kane County State's Attorney Jamie L. Mosser

---

[6] Mr. Williams substituted Chief Cross for Chief Ziman as a defendant in his amended complaint in the Second Case, ECF No. 30, presumably because Chief Cross took over from Chief Ziman as the Chief of Police.

- Kane County Assistant State's Attorneys Heena Patel and Eric F. Walliser

- Kane County employee Dawn Miller

- John Doe (person responsible for uploading the traffic stop video)

- City of Aurora

- Mayor of Aurora Richard Irvin

- City of Aurora's Attorney Deborah Lang

- Chief of Police Keith Cross

- Sergeant Jeff Tate

- Officers Matthew Huber, Timothy Young, Andrew Martin, and Antonio Piscopo

   The complete list of counts in the ACC is:

- *Count I*: Violation the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(c), against all defendants.

- *Count II*: Violation of the Supremacy Clause and the Fourteenth Amendment against the State of Illinois, Governor Pritzker, and Attorney General Raoul.

- *Count III*: Violation of Article III and the guarantee of due process under the Fourteenth Amendment against the State of Illinois, Governor Pritzker, Attorney General Raoul, Kane County, and the City of Aurora.

- *Count IV*: Conspiracy to violate the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, against all defendants.

- *Count V*: Violation of the guarantee of equal protection under the Fourteenth Amendment against all defendant police officers and the City of Aurora.

- ***Count VI***: Violation of the guarantee of equal protection under the Fourteenth Amendment against State's Attorney Mosser, State's Attorney Patel, State's Attorney Walliser, and Kane County.

- ***Count VII***: Denial of due process in violation of the Fifth Amendment and the Fourteenth Amendment against Kane County, Judge Hull, Judge Camargo, Judge Cowart, Judge DiGiovanni, and Judge Cruz.

- ***Count VIII***: Conspiracy to deprive the plaintiff of his constitutional rights against Chief Cross, Mayor Irvin, City of Aurora's Attorney Lang, John Doe, Officer Huber, Officer Young, and Sergeant Tate.

- ***Count IX***: Conspiracy to deprive the plaintiff of his constitutional rights against State's Attorney Mosser, State's Attorney Patel, State's Attorney Walliser, Judge Camargo, Judge Cowart, Judge DiGiovanni, Judge Cruz, and Dawn Miller.

- ***Count X***: Unlawful seizure in violation of the Fourth Amendment against the City of Aurora, Officer Huber, Officer Young, Officer Martin, and Officer Piscopo.

- ***Count XI***: False arrest in violation of the Fourth Amendment against Officer Huber, Officer Young, Officer Martin, and Officer Piscopo.

- ***Count XII***: Violation of the guarantee of freedom of association under the First Amendment, the Thirteenth Amendment, and the Fourteenth Amendment against the State of Illinois, Governor Pritzker, Attorney General Raoul, and the City of Aurora.

- ***Count XIII***: Violation of the guarantee of freedom of association and religion under the First Amendment against the State of Illinois, Governor Pritzker, Attorney General Raoul, and the City of Aurora.

- ***Count XIV***: Violation of the Thirteenth Amendment against the City of Aurora, Officer Young, and Officer Huber.

- ***Count XV***: Failure to intervene to prevent the violation of the plaintiff's rights under the Fourth and Fourteenth Amendment against Officer Piscopo, Officer Martin, Sergeant Tate, Mayor Irvin, City of Aurora's Attorney Lang, and John Doe.

- ***Count XVI***: Failure to prevent the wrongs of a conspiracy to deprive the plaintiff of his constitutional rights against Kane County, Judge Camargo, Judge DiGiovanni, Judge Cowart, State's Attorney Walliser, and State's Attorney Mosser.

- ***Count XVII***: National origin and race discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, against the City of Aurora.

- ***Count XVIII***: Violation of international law against the City of Aurora, the State of Illinois, and Kane County.

- ***Count XIX***: Monell claim against the City of Aurora.

- ***Count XX***: Violation of the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5, against the City of Aurora, Chief Cross, Sergeant Tate, and Officer Young.

- ***Count XXI***: Violation of the Illinois FOIA against the City of Aurora.

- ***Count XXII***: Indemnification against the City of Aurora, Kane County, and the State of Illinois.[7]

## DISCUSSION

"Federal Rule of Civil Procedure 15(a) provides that, after a responsive pleading has been served, a party must obtain leave of the court or written consent of the opposing party to amend a pleading." *Garner v. Kinnear Mfg. Co.*, 37 F.3d 263, 269 (7th Cir. 1994). On October 2, 2023, the

---

[7] This Count is misnumbered as "XXXII" in the ACC.

Court granted Mr. Williams "leave to file an amended complaint consolidating his claims in this case and in [the Second Case]." The Court's Order did not grant Mr. Williams leave to supplement his existing claims or to add new claims. The ACC adds these elements. Therefore, Mr. Williams was right to file a motion for leave to amend his complaint; because his proposed amendments exceed the scope of the Court's prior Order, Mr. Williams must obtain leave of the Court or written consent from the opposing parties to substitute his existing complaint for the ACC.

To inform the Court's decision about whether to grant Mr. Williams' motion for leave to amend his complaint, the Court screens the ACC. To begin, the Court determines whether it has subject-matter jurisdiction over the claims in the ACC. All cases "must" be dismissed *sua sponte* "if the court determines at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3). "Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction[,] it must proceed no further." *Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998). Unlike state courts, which are courts of general jurisdiction, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Article III of the U.S. Constitution limits the subject-matter jurisdiction of the federal courts to certain "cases" or "controversies." § 2. To invoke the jurisdiction of the federal courts, Mr. Williams "must satisfy the threshold requirement imposed by Article III . . . by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). A case or controversy requires a plaintiff who has standing, and "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). To have standing, a plaintiff must satisfy three requirements. First, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some

13

direct injury' as the result of the challenged [ ] conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101-02. To have standing for damages, the plaintiff would have to show a current injury. To have standing for injunctive relief, the plaintiff "would have to credibly allege that he faced a realistic threat from the future application of the [challenged conduct]." *Id*. at 106 n.7. "Second, the injury must be fairly traceable to the challenged [conduct.]" *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 925 (7th Cir. 2008). "Third, it must be likely, not just speculative, that a favorable decision will redress the injury" or threat of injury. *Id*. In addition to standing, the doctrines of mootness, ripeness, and political question also flow from Article III's case-or-controversy requirement. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Within the outer boundary set by Article III, Congress determines the jurisdiction of the federal district courts. Congress has granted federal district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A federal district court also has supplemental jurisdiction over any claim that is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). District courts do not possess appellate jurisdiction, and only the U.S. Supreme Court can review final state-court judgments. *See* 28 U.S.C. § 1257.

If claims in the ACC survive screening for lack of subject-matter jurisdiction, the Court then screens those claims for other issues. Mr. Williams is proceeding *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915(a). All complaints accompanied by an IFP request are subject to screening under 28 U.S.C. § 1915(e)(2).[8] The complaint, or any claim therein, must be dismissed

---

[8] Mr. Williams paid the filing fee in the Second Case. However, his complaints in this case are still subject to IFP review. See § 1915(e)(2) (subjecting cases to screening "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid"); *Zloza v. City of Mauston*, No. 23-

"at any time" if the Court determines that the complaint or claim "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *Id*.

An action or claim is frivolous under § 1915(e)(2)(B)(i) if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "A claim is legally frivolous if it is 'based on an indisputably meritless legal theory.'" *Felton v. City of Chicago*, 827 F.3d 632, 635 (7th Cir. 2016) (quoting *Neitzke*, 490 U.S. at 327-28) (emphasis omitted). A claim is factually frivolous if its allegations are "clearly baseless, fanciful, fantastic, delusional, irrational, or wholly incredible," as distinguished from "unlikely, improbable, or strange." *Id*. (quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)) (cleaned up).

Courts apply the Rule 12(b)(6) standard to screen complaints for failure to state a claim under § 1915(e)(2)(B)(ii) (the Rule and the IFP statute contain nearly identical language). *See Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). Under federal pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true" (a difference from the § 1915(e)(2)(B)(i) standard). *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013). But courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

---

2900, 2024 WL 1104782, at *1 (7th Cir. Mar. 14, 2024) (sua sponte dismissal for frivolousness permitted "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid").

States and state officials sued in their official capacity may be protected by state sovereign immunity under the Eleventh Amendment of the U.S. Constitution. Government officials sued in their individual capacities may be protected by officer immunity, including absolute legislative, prosecutorial, and judicial immunity, as well as qualified immunity.

To screen the ACC, the Court groups its factual allegations into claims, then screens those claims. The ACC is not organized around Mr. Williams' claims. Rather, it is structured into a "Factual Allegations" section, followed by twenty-two "Counts," which contain factual allegations and legal conclusions. Mr. Williams uses counts to plead different legal theories, which are distinct from claims. "[A] claim is "the aggregate of operative facts which give rise to a right enforceable in the courts." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 599 (7th Cir. 2011) (quoting *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir. 1943)). More than one legal theory may support a single claim. To survive a motion to dismiss, a complaint need only set forth "a short and plain statement of [a] claim" showing that the plaintiff is plausibly entitled to relief. Fed. R. Civ. P. 8(a). "[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). Therefore, the Court focuses its analysis on the factual allegations in the ACC; the Court only addresses Mr. Williams' legal theories to the extent necessary to screen his claims.

The Court reorganizes the ACC into the following ten claims:

- ***Claim I***: Against Officer Young, Officer Huber, Officer Piscopo, Officer Martin, Sergeant Tate, Chief Cross, Mayor Irvin, and the City of Aurora for the traffic stop.[9]

---

[9] Counts V, X-XI, XIV-XV, XVII-XVIII, and XIX-XX relate to this claim.

- ***Claim II***: Against the State of Illinois, Governor Pritzker, Attorney General Raoul, the City of Aurora, Chief Cross, Sergeant Tate, and Officer Young for using, maintaining, and disseminating a gang database.[10]

- ***Claim III***: Against the State of Illinois, Governor Pritzker, Attorney General Raoul, and the City of Aurora challenging two state "gang statutes."[11]

- ***Claim IV***: Against all defendants for conspiring to obtain Mr. Williams' conviction for a traffic violation by editing the squad camera video of the traffic stop and/or failing to intervene to prevent this wrong.[12]

- ***Claim V***: Against State's Attorney Mosser, State's Attorney Patel, State's Attorney Walliser, and Kane County for selective prosecution.[13]

- ***Claim VI***: Against the State of Illinois, Governor Pritzker, Attorney General Raoul, Kane County, and the City of Aurora for lack of standing to bring charges.[14]

- ***Claim VII***: Against Kane County, Judge Hull, Judge Camargo, Judge Cowart, Judge DiGiovanni, and Judge Cruz for judicial bias against Mr. Williams.[15]

- ***Claim VIII***: Against all defendants for substantially burdening Mr. Williams' religious exercise.[16]

---

[10] Counts XII-XIII, and XIX-XX relate to this claim.

[11] Counts II and XII-XIII relate to this claim.

[12] Counts IV, VIII-IX and XV-XVI relate to this claim.

[13] Count VI relates to this claim.

[14] Count III relates to this claim.

[15] Counts VII and IX relate to this claim.

[16] Count I relates to this claim.

- ***Claim IX***: Against the State of Illinois, Governor Pritzker, and Attorney General Raoul challenging the Illinois driver licensing law.[17]

- ***Claim X***: Against the City of Aurora for denying his Illinois FOIA request.[18]

As follows, the Court describes the factual allegations that make up each of these claims and screens the claims for lack of subject-matter jurisdiction by the Court, frivolousness and maliciousness, failure to state a claim on which relief may be granted, and defendant immunity. As will be seen, however, the Court lacks subject-matter jurisdiction as to most of Mr. Williams' claims, so it will be largely unnecessary to address the substance of those claims. The Court's reticence, however, should not be confused with endorsement. Most of Mr. Williams' claims are frivolous and would fail even if the Court had jurisdiction to address them.

## I.    Traffic stop

The Court does not repeat the factual allegations already detailed in the background section of this opinion. In addition to those allegations, Mr. Williams alleges that police officers stop black drivers more often than white drivers in Aurora. *See* ACC 25-26, 40-42, 54.

From Officer Young's questions about Mr. Williams' itinerary and the allegedly racially disparate pattern of traffic stops in Aurora, Mr. Williams concludes that the officers' stated reason for the August 2019 traffic stop was a pretext "to search for evidence of crimes unrelated to traffic violations, and/or as an alleged strategy of general deterrence, based on discriminatory stereotypes that Black and Latino drivers are more likely than white drivers to commit crimes or possess contraband." *Id*. at 40. He concludes that "had [he] been a white male driving in the neighborhood

---

[17] Count II relates to this claim.

[18] Count XXI relates to this claim.

he was in, he would have not been stopped unless he was known to the Officers," and he would not have been issued traffic tickets unless contraband was found. *Id*. at 55.

Mr. Williams characterizes Officer Young's language during the traffic stop as "that of someone who believes he is a master and has authority over another man." *Id*. at 65-66. Based on Officer Young's language and the history and practices of the APD, Mr. Williams asserts that the APD and its Special Operations Group "must be considered and defined as Badges and Incidents of Slavery" under the Thirteenth Amendment of the U.S. Constitution. *Id*. at 66.

He seeks injunctive relief and damages from Officer Huber, Officer Young, Officer Martin, Officer Piscopo, Sergeant Tate, Chief Cross, Mayor Irvin, and the City of Aurora. In one count supporting Claim I, Mr. Williams specifies that he seeks to enjoin the City of Aurora from its "policy, practice and/or custom of unconstitutional stops, arrests, and searches." *Id*. at 70.

To screen Claim I, the Court starts with subject-matter jurisdiction. At this stage, the Court cannot conclude that it lacks subject-matter jurisdiction as to Mr. Williams' claims for damages based on the traffic stop. Mr. Williams alleges that he suffered an unconstitutional traffic stop. He challenges the conduct of the officers who stopped him, the failure of Sergeant Tate and Mayor Irvin to intervene, and the City of Aurora's alleged policy or practice of unconstitutional stops. For now, the Court is satisfied that these allegations show a current injury caused by the challenged conduct and that Mr. Williams' injuries could be redressed by damages.

However, Mr. Williams has not shown standing for injunctive relief, so this Court lacks subject-matter jurisdiction over Claim I to the extent that Mr. Williams seeks this form of relief. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). More than four years elapsed between August 2019 and

19

the filing of the ACC, yet Mr. Williams has not alleged that he has suffered any further traffic stops. *See Lyons*, 461 U.S. at 108 (noting that five months had passed between the allegedly unlawful police conduct at the root of the plaintiff's claim and the filing of the complaint, "yet there was no allegation of further unfortunate encounters between [the plaintiff] and the police"). Other than his allegation that he suffered an unlawful traffic stop in August 2019, Mr. Williams has not plead any factual allegations to support a finding by the Court that he faces a realistic threat from future application of the challenged conduct. Thus, the Court cannot grant injunctive relief. It considers the merits of Claim I only to the extent that Mr. Williams seeks damages.

To screen Claim I under § 1915(e)(2), the Court analyzes Mr. Williams' allegations defendant-by-defendant (or by group, if the analysis applies to multiple defendants). The Court begins with the City of Aurora, Mayor Irvin, Sergeant Tate, and Chief Cross in his official capacity. Then, the Court turns to the responding officers and Chief Cross in his individual capacity.

On February 8, 2021, the Court dismissed Mr. Williams' traffic-stop claims against the City of Aurora, Mayor Irvin, and Sergeant Tate with prejudice. *Williams I*, 2021 WL 428829, at *1-2. Mr. Williams had failed to respond to the defendants' motion to dismiss for failure to state a claim upon which relief may be granted, and the Court held that his failure to respond constituted a forfeiture of his claims.[19] *Id.* In the ACC, Mr. Williams raises substantially identical claims against these defendants. Therefore, the doctrine of law of the case applies. This doctrine typically

---

[19] The Court's Order used the term "waiver or concession," citing a Seventh Circuit opinion that used the term "waiver" and other Seventh Circuit opinions that used the term "forfeiture." The Seventh Circuit has recently emphasized the difference between these concepts. *See, e.g. United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019) ("An issue is waived when a defendant intentionally relinquishes a known right; it is merely forfeited when a defendant neglects to timely object."). The Court notes that "forfeiture" appears to be the accurate term here, but the distinction between the concepts is not important in the present posture (on appeal, forfeited arguments are subject to plain error review, whereas waived arguments are not reviewed at all, *id.*).

provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1984). "This doctrine serves to maintain consistency and avoid reconsideration of matters once decided in the course of a single lawsuit." *United States v. Feldman*, 825 F.2d 124, 130 (7th Cir.1987) (quoting 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 4478, at 781 (1981 ed.)).

The Court declines to reconsider whether to dismiss Mr. Williams' traffic-stop claims against the City of Aurora, Mayor Irvin, and Sergeant Tate. Although law of the case is a discretionary doctrine, no "good reasons" for reexamination have appeared, such as "new evidence or controlling law." *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir. 1985). Therefore, the Court applies the law of the case to the sufficiency of Mr. Williams' claims and does not reconsider the merits of this issue. To the extent that Mr. Williams sues Chief Cross in his official capacity based on the traffic stop, the law-of-the-case doctrine also applies because the Court would treat the claim as one against the City of Aurora. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). In sum, based on the law-of-the-case doctrine, Mr. Williams' claims against the City of Aurora, Mayor Irvin, Sergeant Tate, and Chief Cross in his official capacity are insufficient to state a plausible claim to relief, so these claims fail screening under § 1915(e)(2)(B)(ii).

The Court must still consider Mr. Williams' claims against the four responding officers (Officers Young, Huber, Martin, and Piscopo) and Chief Cross in their individual capacities. Mr. Williams sues these defendants under both the ICRA and 28 U.S.C. § 1983. The Court starts by considering Mr. Williams' ICRA theory. He sues two of the remaining defendants, Officer Young

and Chief Cross, for a violation of the ICRA under a disparate impact theory, pursuant to 740 ILCS 23/5(a)(2). The ICRA, however, provides a cause of action against only three potential parties: the State of Illinois, its counties, and its local governments. Because the ICRA does not provide a cause of action against individual defendants, Mr. Williams' ICRA theory fails. Nonetheless, the Court must still consider Mr. Williams' § 1983 theory, which he offers in support of his traffic-stop claims against all five remaining defendants. To the extent that Mr. William's § 1983 theory against the remaining defendants fails, Claim I fails entirely, since this theory is the only remaining theory that (purportedly) supports Claim I.

Section 1983 provides a cause of action against state and local officials for conduct committed "under color of" state law that deprives a person of federal rights. To make out a prima facie claim under § 1983, a plaintiff must identify a predicate violation of a federal right. *See Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992). And "a defendant must have been 'personally responsible' for the deprivation of the right at the root of a § 1983 claim for that claim to succeed." *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011).

In the ACC, Mr. Williams asserts that he suffered deprivations of his Fourth, Thirteenth, and Fourteenth Amendment rights based on the traffic stop. His Thirteenth Amendment theory is that the "institution of the [APD]" is a badge or incident of slavery. ACC 66. This theory is frivolous because only Congress has the power to recognize badges or incidents of slavery. Section 2 of the Thirteenth Amendment provides that "Congress shall have power to enforce this article by appropriate legislation." In The Civil Rights Cases, the Supreme Court held that § 2 grants Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." 109 U.S. 3, 20 (1883). By contrast, this Court's power is limited to enforcing § 1's prohibition on slavery and involuntary servitude (and legislation passed ***by***

*Congress* under § 2). Mr. Williams neither alleges that policing constitutes slavery or involuntary servitude under § 1 nor that existing legislation abolishes policing as a badge or incident of slavery under § 2. Rather, he asks this Court to recognize policing as a new badge or incident of slavery. The Court does not have such power, so Mr. Williams' Thirteenth Amendment theory is indisputably meritless.

Mr. Williams' Fourteenth Amendment theory asserts that the officers stopped and ticketed him because of his race. Racially selective enforcement can violate the Equal Protection Clause of the Fourteenth Amendment, so this theory is not legally frivolous. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). Thus, the Court asks whether allegations in the ACC plausibly substantiate this theory. To prevail based on a selective enforcement theory, a plaintiff must provide "proof 'that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001)). Discriminatory purpose implies "that the decisionmaker [in the plaintiff's case] . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Conley*, 5 F.4th at 789 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)).

In this case, for Mr. Williams' selective enforcement theory to support a plausible claim based on the traffic stop, the ACC must contain sufficient factual allegations to plausibly suggest that similarly situated white individuals were not stopped or ticketed (discriminatory effect) and that the defendant officers stopped and ticked Mr. Williams because of his race (discriminatory purpose). The only relevant allegation in the ACC is statistical. Specifically, Mr. Williams alleges that police are 6.2 times more likely to pull over Black drivers than white drivers in Aurora. ACC 40-41. This statistical allegation is insufficient. In the context of a theory that the "officer-

defendants are intentionally discriminating against the plaintiffs" by subjecting them to traffic stops (the same context here), the Seventh Circuit held that "statistics may not be the sole proof of a constitutional violation." *Chavez*, 251 F.3d at 647-48. That is particularly so when the statistics proffered do not control for variables and reflect only correlation rather than causation. "Correlation is not causation." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988). Applying *Chavez*, the ACC fails to allege facts that plausibly support a selective enforcement claim against the officers or Chief Cross—as to whom Mr. Williams offers no fact allegations plausibly suggesting that they (as opposed to other officers) disproportionately ticket black drivers.

Finally, the Court turns to Mr. Williams' Fourth Amendment theory. His theory is that the responding officers lacked justification to stop and detain him. Again, this legal theory is not frivolous; a traffic stop constitutes a "seizure" under the Fourth Amendment and "is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Wren v. United States*, 517 U.S. 806, 810 (1996). To be reasonable, a traffic stop must be "justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (quoting *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004)). Reasonable suspicion of a traffic violation justifies a traffic stop. *Id*. An ulterior motive (*e.g.*, obtaining evidence of other crimes) does not invalidate a traffic stop justified on this basis. *See id*. at 428 n.1. However, police may not detour from the original mission of the stop to investigate other crimes without an independent justification for prolonging the stop. *Id*. at 428.

At trial in the state court proceedings, Officers Young and Piscopo both testified that they had seen Mr. Williams fail to signal 100 feet before turning and disobey a stop sign. ACC 37-38. Judge DiGiovanni credited the officers' testimony regarding Mr. Williams' failure to signal, and

she found him guilty of that traffic violation. As the Court will explain, Mr. Williams cannot relitigate the fact that he committed a traffic violation. As a result, his Fourth Amendment theory must fail.

"Issue preclusion prevents a party from relitigating an issue that it has previously litigated and lost." *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002). To determine the appropriate preclusive effect to give a state-court judgment, federal courts must look to the rendering state's law (here, Illinois law). *Id.*; *see also* 28 U.S.C. § 1738. "In Illinois, issue preclusion applies when, in two consecutive cases, the same controlling issue or fact material to the determination is at stake, and that issue was adjudicated against a party in the first suit." *Foley*, 295 F.3d at 748-49 (citing *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471 (Ill. 2001)). More specifically, Illinois imposes three requirements for issue preclusion (collateral estoppel) to apply: "(1) the issue decided in the prior adjudication is *identical* with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Nowak*, 757 N.E.2d at 478. A final state-court decision rendered after the federal suit begins is preclusive under Illinois law. *See Svendsen v. Pritzker*, 91 F.4th 876, 878 (7th Cir. 2024) (canvassing Illinois law).

In this case, whether Mr. Williams committed a traffic violation is material to the Court's determination of whether the officers had a lawful basis to initiate the August 2019 traffic stop. If the officers saw Mr. Williams actually commit a traffic violation, then they had reasonable suspicion—indeed, probable cause—to believe the same. Mr. Williams cannot relitigate whether he committed a traffic violation because all three requirements for applying issue preclusion as to that fact are met. First, the same fact was litigated in his state-court proceedings. Second, his conviction by the state court for failure to signal 100 feet before turning was a final judgment on

the merits. Third, identity of the party (Mr. Williams) is present. Accordingly, Mr. Williams may not relitigate whether he committed a traffic violation, so uncontestable facts establish that the responding officers had reasonable suspicion to stop him. His Fourth Amendment theory fails.[20]

In sum, no claims based on the traffic stop survive screening. To the extent Mr. Williams seeks injunctive relief, he has not shown standing. To the extent he seeks damages, Claim I fails on the merits. Based on the law-of-the-case doctrine, Mr. Williams' claims against the City of Aurora, Mayor Irvin, Sergeant Tate, and Chief Cross in his official capacity fail screening under § 1915(e)(2)(B)(ii). Mr. Williams' claims against the four responding officers and Chief Cross in his individual capacity also fail screening under § 1915(e)(2)(B)(ii); the factual allegations in the ACC do not substantiate Mr. Williams' nonfrivolous legal theories based on the traffic stop, or they are insufficient to raise his right to relief above the speculative level. Accordingly, Claim I warrants dismissal.

## II. Gang Database

Mr. Williams alleges that "[t]he City [of Aurora] of [sic] through the Aurora Police Department uses, maintains, publishes, and shares a Gang Database of all suspected alleged gang members in the City." ACC 18. His legal theories are based on two principal allegations about the database. First, he alleges that "[t]he City has a policy and practice of including Plaintiff as well as other Black and Latinx individuals who have not participated in any gang activity in the Gang Database for no justifiable reason other than their race and national origin." *Id*. at 72. Second, he

---

[20] To the extent that Mr. Williams' complaint can be read to assert that the stop was too long, this contention is just another take on his argument that the stop was a pretext for a gang investigation; Mr. Williams alleges that the officers asked several questions directed toward whether he had visited a nearby house that police were surveilling due to reported gang activity. As such, this theory also fails because (as evidenced by his conviction) the officers had probable cause to arrest him regardless of their subjective motivation. Further, a handful of questions about where Mr. Williams was traveling did not unreasonably extend the stop. *See Cole*, 21 F.4th at 429.

alleges that the defendants (he does not specify which defendants) "target[] and discriminate[] against [him] because he has been labeled as a gang member and put in a database." *Id.* at 63. Based on these allegations, Mr. Williams asserts counts against the State of Illinois, Governor Pritzker, Attorney General Raoul, and the City of Aurora under § 1983 for a deprivation of his First Amendment rights. In addition, he asserts a count against the City of Aurora, Chief Cross, Sergeant Tate, and Officer Young under the ICRA, 740 ILCS 23/5(a)(2). He seeks damages, injunctive relief, and "a declaration that the Gang Database is unconstitutional." *Id.* at 48.

Mr. Williams' allegations are insufficient to invoke the jurisdiction of the Court because he has not shown that he has standing to bring a claim challenging the City of Aurora's alleged gang database. He alleges that he was stopped once and questioned about his ties to a gang house. In the ACC, he does not allege that the traffic stop had anything to do with the gang database. In addition, and as previously noted, more than four years elapsed between August 2019 and the filing of the ACC, yet Mr. Williams has not alleged any further encounters with police. In short, Mr. Williams does not show that he has been subject to traffic stops (current injury) or that he is in immediate danger of being subject to traffic stops (future injury) because of the gang database. He therefore lacks standing to assert a claim predicated on the defendants' use of a gang database.

To the extent that Mr. Williams is attempting to establish standing based on a chilling-effect injury, his allegations are still insufficient. Chilling effect injuries can provide a basis for standing. *See, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 760-69 (7th Cir. 2023). "Plaintiffs may [ ] establish standing based on a current injury if they have resorted to self-censorship out of 'an actual and wellfounded fear' that the law will be enforced against them." *Id.* at 761 (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988)) (emphasis omitted). Alternatively, plaintiffs may establish standing based on "a sufficient threat of an imminent future injury." *Id.*

"To demonstrate such circumstances, the plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by [the] statute.'" *Id*. (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Mr. Williams alleges "[t]he gang database . . . allows the Defendants to interfere with Plaintiff's right to associate with others who may be in the gang database without fear of being charged with any of the [gang] statutes that are targeted toward Plaintiff and members of his church, family, and friends." ACC 64. This allegation does not demonstrate an actual and wellfounded fear, so is insufficient to support standing based on a current or future chilling effect injury. "When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. at 298-99 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

The Court therefore concludes that it lacks subject-matter jurisdiction under Article III over Claim II and this claim warrants dismissal without prejudice.

## III.    Gang Statutes

Mr. Williams' constitutional challenge to two statutes targeting gangs fails for much the same reason. The ACC identifies two such "gang statutes": the Illinois Streetgang Terrorism Omnibus Prevention Act ("Illinois STOP") and Illinois RICO. *See* ACC 63. He asserts that, under the Illinois RICO statute, "Plaintiff can be charged simply for having friends or associates that the State of Illinois or any Law Enforcement Agency in this state deems are gang members." *Id*. at 18. His objection to the Illinois STOP is only the very general accusation that it "criminalizes him and who he hangs together [with]." *Id*. at 63. He fears that he will be charged with violations of these "gang statutes" because he associates with persons whose names are included in the gang database. *Id*. at 64. Based on these allegations, he brings an action under § 1983 against the State of Illinois,

Governor Pritzker, Attorney General Raoul, and the City of Aurora for a deprivation of his First Amendment rights. He seeks damages and injunctive and declaratory relief. *See id*. at 63-64.

For the same reasons that the Court lacks subject-matter jurisdiction over Mr. Williams' challenge to the gang database, the Court also lacks subject-matter jurisdiction over his challenge to the gang statutes. Mr. Williams does not allege that he has ever been charged under those statutes. To the extent he fears being charged under them, his fear is imaginary or speculative. Therefore, the Court determines that it also lacks subject-matter jurisdiction over Claim III. Accordingly, this claim warrants dismissal without prejudice.

## IV.    Fraud on the Court

Mr. Williams alleges that the August 2019 traffic stop lasted for over an hour. *Id*. at 28, 32. However, the squad camera video of the traffic stop that he received during discovery in the state-court proceeding lasts only twenty-two minutes. *Id*. at 38. Because the length of the video is shorter than an hour, Mr. Williams concludes that it must have been edited. He asserts that various defendants edited the video, including Chief Cross, Officer Young, Officer Huber, Sergeant Tate, and John Doe. ACC 8, 58, 67. Mr. Williams concludes that the defendants formed a conspiracy to ensure that he "would be found liable for violating the traffic citations he was issued on August [2]7, 2019," by editing the video in some way that led to his conviction (Mr. Williams does not specify how). *Id*. at 58. He seeks to hold other defendants liable for participating in the conspiracy or for failing to prevent the "wrongs caused by the conspiracy" based on the following allegations: City of Aurora's Attorney Lang failed to turn over the unedited version of the video, state's attorneys mailed or emailed him the video, and state-court judges failed to dismiss his case "for a Brady violation and fraud upon the court." *Id*. at 68; *see also id*. at 44, 59, 67.

More broadly, Mr. Williams asserts that the defendants are participants in a "scheme to profit and otherwise benefit from the revenue generated from traffic stops and the fines assessed

against the Plaintiff and conspiring [sic] to discriminate on the basis of race and National origin to uphold the institution of slavery by forcing Plaintiff to pay fines to fund the government operations either directly and/ or indirectly." *Id*. at 7; *see also id*. at 20-22. The ACC does not include a full list of which defendants are allegedly involved in the fraud conspiracy or the "traffic fines and fees scheme." *Id*. at 22. To the extent that the fraud conspiracy and the traffic fines and fees scheme are distinct, the Court infers that Mr. Williams' contention is that the fraud conspiracy was committed in furtherance of the traffic fines and fees scheme. Regardless, any harm to Mr. Williams from either conspiracy/scheme is from the alleged editing of the video, which is the only potentially unlawful act alleged in the ACC.[21]

Pursuant to 18 U.S.C. §§ 1985 and 1986, Mr. Williams sues Chief Cross; Officers Huber, Young, Piscopo, and Martin; Sergeant Tate; Mayor Irvin; City of Aurora's Attorney Lang; John Doe; State's Attorneys Mosser, Walliser, and Patel; Judges Camargo, Cowart, DiGiovanni, and Cruz; Dawn Miller; and Kane County. In addition, Mr. Williams sues all defendants for conspiring to violate the TVPA based on the alleged traffic fines and fees scheme. He seeks damages and injunctive relief in the TVPA count; he does not otherwise specify what relief he seeks.

To screen Claim IV, the Court starts and ends with subject-matter jurisdiction. To the extent that Mr. Williams seeks injunctive relief, he does not show standing. He has not alleged that he faces a threat of future harm from the alleged conspiracy. And to the extent that Mr. Williams seeks damages for an injury caused by his conviction, the *Rooker-Feldman* doctrine strips this

---

[21] In Count IV, Mr. Williams alleges that all defendants unlawfully obtained his labor by forcing him to give up his time to appear in court and pay fines and fees. This theory is frivolous. There is nothing unlawful about the bare fact of requiring a person to defend himself in court or the government imposing a fine or a fee on a person. Indeed, it is the essence of due process to afford a defendant his day in court. *See Alexander v. McKinney*, 692 F.3d 553, 557 n.2 (7th Cir. 2012) ("It would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of the trial is to *effectuate* due process.").

Court of jurisdiction. "The *Rooker-Feldman* doctrine imposes a 'jurisdictional bar' that prohibits federal courts other than the Supreme Court of the United States from reviewing final state court judgments." *Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 399 (2023) (quoting *Andrade v. City of Hammond*, 9 F.4th 947, 948 (7th Cir. 2021)). This doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). For reasons that the Court will explain, Mr. Williams' claim for damages based on the squad camera video (i.e., his fraud-on-the-court claim) falls within the ambit of *Rooker-Feldman*.

The proceedings in this Court started before Mr. Williams' conviction for failure to signal became final, but Mr. Williams' claims related to the state-court proceedings are new. Therefore, in relation to his added claims based on the state-court proceedings, including Claim IV, the challenged state-court judgment was "rendered before the district court proceedings commenced," and Mr. Williams is a "state-court loser." *Id.*; *cf. Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570 (7th Cir. 2006) (stating that an amended complaint "kicks off a new action [ ] if . . . it does not 'relate back' to the original complaint" and collecting cases).

With this foundation laid, the Court turns to the other requirements for applying the *Rooker-Feldman* doctrine. The Seventh Circuit has interpreted the Supreme Court's language in *Exxon* to impose two requirements: First, the federal claim must "'directly' challenge a state court judgment" or be "inextricably intertwined with one." *Hadzi*, 62 F.4th at 399 (quoting *Andrade*, 9 F.4th at 950). Federal claims are inextricably intertwined with a state-court judgment when "the plaintiff alleges an injury 'caused by the state court judgment.'" *Id.* (quoting *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016)). Second, the federal plaintiff must have

"had a reasonable opportunity to raise the [ ] issue in state court proceedings." *Id.* (quoting *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017)). "In determining whether a plaintiff had a reasonable opportunity to bring [his] claim, '[courts] focus on difficulties caused not by opposing parties, but by state-court rules or procedures.'" *Id.* at 408 (quoting *Beth-El All Nations Church v. City of Chi.*, 486 F.3d 286, 292 (7th Cir. 2007)). To the extent that Mr. Williams seeks damages, both requirements are met.

The Seventh Circuit has applied *Rooker-Feldman* to fraud-on-the-court claims, so the Court starts by describing that precedent. In *Kasprzyk v. Axiom Fin. LLC*, 811 F. App'x 381 (7th Cir. 2020), the plaintiff, Augustyn Kasprzyk, lost his home in a foreclosure action. *Id.* at 382. Later, Mr. Kasprzyk sued in federal court seeking monetary damages for allegedly fraudulent acts by the defendants. He asserted that the defendants (lending institutions) "conspired to foreclose on his home by issuing him a loan using fraudulent documents and misrepresenting the status of his mortgage assignments." *Id.* The Seventh Circuit explained that "[h]is claim that the defendants conspired . . . to mislead the state court about the validity of his loan and the status of his mortgage assignments is barred because '[n]o injury occurred until the state court ruled against [him].'" *Id.* at 383 (quoting *Mains v. Citibank, N.A.*, 852 F.3d 669, 677 (7th Cir. 2017)).

Like Mr. Kasprzyk, Mr. Williams asserts that the defendants conspired to obtain a state-court judgment against him using fraud. He seeks to recover on a theory that the defendants "withheld, concealed, and edited the squad cam video so [he] would be found liable for violating the traffic citations he was issued." ACC 58. No injury occurred until the state court convicted him of a traffic violation, so his theory "is precisely what *Rooker-Feldman* prohibits." *Kasprzyk*, 811 F. App'x. at 383 (quoting *Mains*, 852 F.3d at 676). *Compare Iqbal v. Patel*, 780 F.3d 728, 730 (7th Cir. 2015) (distinguishing a suit based on fraudulent acts by the defendants where a plaintiff seeks

"damages for activity that (he alleges) predates the state litigation and caused injury independently of it"). Thus, the first element for applying the *Rooker-Feldman* doctrine is present. Mr. Williams also had a reasonable opportunity to raise his fraud-related federal constitutional issues in state court. Mr. Williams does not argue that state law or procedures prevented him from raising these issues. In fact, he raised constitutional issues based on the allegedly edited squad camera video in a "petition to dismiss the citations for fraud upon the court." ACC 36. Accordingly, both elements needed for applying the *Rooker-Feldman* doctrine are present.

The Court therefore concludes that it lacks subject-matter jurisdiction over this claim. To the extent that Mr. Williams seeks injunctive relief, he has not shown that he has standing. To the extent that he seeks damages, the Court lacks jurisdiction under the *Rooker-Feldman* doctrine. If a court lacks subject-matter jurisdiction, the claim "can go no further," *Hadzi*, 62 F.4th at 399. Therefore, Claim IV warrants dismissal without prejudice.

## V. Selective Prosecution

Mr. Williams alleges that "Defendants" (presumably only Kane County, despite use of the plural) maintain a "policy, custom, and/or practice" of selective prosecution. ACC 56. He alleges that the defendants' "selective prosecution includes but is not limited to the following policies, practices, and customs: (a) [p]rosecuting extremely high volumes of traffic cases concentrated in neighborhoods where predominantly Black or Latino residents live; [and] (b) failing to prosecute police officers for lying under oath." *Id*. As a person who "identifies as Black," he alleges that he has been "subjected to selective prosecution motivated by race and/or national origin." *Id*. In addition, he alleges that the defendants' policies "create a real, imminent, and substantial threat that the Plaintiff will again be selectively and discriminately prosecuted." *Id*. at 57. Pursuant to § 1983, he sues Kane County and State's Attorneys Mosser, Patel, and Walliser for a deprivation of his Fourteenth Amendment rights. He does not specify what relief he seeks.

To the extent that Mr. Williams seeks damages, the *Rooker-Feldman* doctrine divests this Court of jurisdiction over Mr. Williams' selective prosecution claim. *See Cain v. Ryan*, 171 F. Supp. 2d 813, 823 (N.D. Ill. 2001) (Gettleman, J.) (holding that the *Rooker-Feldman* doctrine applied to a plaintiff's "claim that his selection for [civil] commitment proceedings . . . was either arbitrary or discriminatory"). This Court is persuaded by Judge Robert Gettleman's analysis of Seventh Circuit precedent. First, "[a]lthough [Mr. Williams] may have had an abstract 'right' not to be selected for" prosecution "in a discriminatory manner, he suffered no *injury* until the state court acted" by adjudicating him guilty of failure to signal. *Id*. Thus, to the extent that he seeks damages, his claim is inextricably intertwined with his conviction. Second, plaintiffs may raise selective prosecution challenges in Illinois state courts. *See, e.g.*, *People v. Peterson*, 397 Ill. App. 3d 1048, 1054-57 (2010) (considering a criminal defendant's appeal from the trial court's order denying his motion to dismiss the charges as selective). This means that Mr. Williams had a reasonable opportunity to raise his federal constitutional issue in his state court prosecution. Therefore, both elements needed for applying the *Rooker-Feldman* doctrine are present.

To the extent that Mr. Williams seeks injunctive relief, the *Rooker-Feldman* doctrine might not apply. General challenges to government policies survive the jurisdictional bar imposed by the doctrine so long as these challenges "do not require review of a final state court judgment in a particular case." *D.C. Ct. App. v. Feldman*, 460 U.S. 462, 486 (1983). Mr. Williams does not specify what injunctive relief he might seek in connection with his selective prosecution claim. At this stage, the Court assumes that he seeks prospective relief not barred by the *Rooker-Feldman* doctrine. Therefore, the Court turns to a different jurisdictional issue: standing.

For Claim V to survive screening for lack of subject-matter jurisdiction, Mr. Williams must show that he has standing for injunctive relief. His allegations in the ACC are insufficient. The

ACC indicates that he has been subject to prosecution for traffic violations. Although he does not make this point explicit, the Court infers that his selective prosecution claim is based on this prosecution. Even if the ACC pleads sufficient facts to make out a plausible selective prosecution claim (the Court sets aside this question for now), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief [ ] if unaccompanied by any continuing, present adverse effects" (as previously quoted). *O'Shea*, 414 U.S. at 495-96. To decide whether Mr. Williams has shown standing for injunctive relief, the Court relies on the Supreme Court's analysis in *O'Shea*.

*O'Shea* was brought by plaintiffs claiming that they had been harmed by discriminatory bond-setting, sentencing, and jury-fee practices. *Id*. at 495. In deciding whether the plaintiffs (respondents in the posture before the Supreme Court) had shown standing for injunctive relief, the Supreme Court reasoned that "the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners." *Id*. at 496. However, the Supreme Court assumed "that respondents will conduct their activities within the law and so avoid prosecution." *Id*. at 497. Therefore, the Supreme Court could not find an Article III case or controversy warranting injunctive relief. It held that a threat of future injury is not "sufficiently real and immediate to show an existing controversy simply because [respondents] anticipate violating lawful criminal statutes and being tried for their offenses." *Id*. at 496.

The Supreme Court's holding in *O'Shea* controls here. As in *O'Shea*, the prospect of future injury in this case rests on the likelihood that Mr. Williams will again be stopped for and charged with traffic violations. He provides no basis to infer that such stops are imminent. Indeed, he does not claim that he has subsequently been stopped for any traffic violation in Aurora (or anywhere

else, for that matter). As a result, the Court does not find a case or controversy warranting injunctive relief.

Regardless of the relief that Mr. Williams seeks, the Court lacks subject-matter jurisdiction over Claim V. Accordingly, Claim V warrants dismissal without prejudice.

## VI.   Lack of Standing

The State of Illinois brought charges against Mr. Williams in the Sixteenth Judicial Circuit in Kane County for failure to signal and disobeying a stop sign. Mr. Williams disputes the State of Illinois's standing to bring charges against him. He alleges that the State lacked an injury because the "People of the State of Illinois . . . is an entity that does not exist" and "Defendants cannot lawfully claim that they are injured in anyway [sic]" if §§ 11-804(b) and 11-1204(b) of the Illinois Vehicle Code (the sections that were enforced against him) "are violated." *Id*. at 19, 52. On this basis, he concludes that the State lacked standing to bring charges against him. *Id*. at 52. Mr. Williams purports to bring an action under § 1983 against the State of Illinois, Governor Pritzker, and Attorney General Raoul for a violation of his rights under Article III and the Fourteenth Amendment. He seeks damages and injunctive relief. *Id*.

Putting aside the frivolous nature of this challenge to a charging convention acknowledging that the State of Illinois derives its powers through the state constitution adopted by "the People of the State of Illinois," this Court also lacks subject-matter jurisdiction over Claim VI for the same reasons that it lacks subject-matter jurisdiction over Mr. Williams' selective-prosecution claim, Claim V. To the extent that he seeks damages, Claim VI is barred by the *Rooker-Feldman* doctrine. Mr. Williams suffered no injury until the state court ruled against him, and he had a reasonable opportunity to raise the issue of standing in state court (indeed, standing in state court is a state-law issue; Article III does not limit the jurisdiction of state courts). To the extent that Mr. Williams seeks injunctive relief, he has not shown that he has standing. His allegations do not show a

credible threat of future imminent injury, as required to show standing for injunctive relief. Accordingly, Claim VI warrants dismissal without prejudice.

## VII.   Judicial Bias

Mr. Williams alleges that the judges who presided over his state-court proceedings had conflicts of interest. He alleges that the state judges and the state's attorneys who prosecuted him are Democrats and that Judges Camargo and DiGiovanni are former State's Attorneys. *Id*. at 44-46. On this basis, he asserts that the judges have personal bias against him. In addition, he alleges that state judges' salaries are indirectly paid by traffic fines, creating financial bias. Following his conviction, he was fined $287.50. *Id*. at 39. Because fines are paid to the government and government revenues fund judicial salaries, Mr. Williams alleges that state judges have a financial incentive to convict defendants accused of traffic violations. *See id*. at 35 (explaining that he filed a motion in the state-court proceeding for Judge Camargo to recuse because "she was receiving payment from the State of Illinois who essentially would benefit financially from a conviction"). Mr. Williams asserts that Judges Camargo and DiGiovanni ignored inconsistencies in officer testimony because of their biases. *See id*. at 44, 46. In addition, he asserts that the other judges who issued orders in his state-court case also committed mistakes of law or fact, presumably because of bias. *See id*. at 46 ("All the judicial officers that issued orders were Democrats and . . . violated their oaths by not supporting the Constitution."). Pursuant to § 1983, he sues Kane County, Judge Hull, Judge Camargo, Judge Cowart, Judge DiGiovanni, and Judge Cruz for a deprivation of his rights under the Due Process Clause of the Fourteenth Amendment.[22] He seeks injunctive relief and damages. *Id*. at 57.

---

[22] Mr. Williams also invokes the Fifth Amendment, but that amendment protects people from actions of the federal government, not state and local governments.

This Court again lacks subject-matter jurisdiction over Mr. Williams' claim. To the extent that he seeks damages, Claim VII is barred by the *Rooker-Feldman* doctrine. Any injury was caused by the judges' adverse rulings in his state-court case, so his injury is inextricably intertwined with a state-court judgment. In addition, he had the opportunity to raise the issue of judicial bias in state court by filing motions to recuse. He availed himself of this opportunity by filing a motion for Judge Camargo to recuse, citing financial bias. *Id*. at 34-35.[23] To the extent that he seeks injunctive relief, he has not plead allegations to support standing (again, he does not allege a threat of future imminent injury). Thus, Claim VII warrants dismissal without prejudice.

## VIII. Illinois Rules of the Road

Finally, in relation to his state-court-proceedings, Mr. Williams challenges Illinois Vehicle Code §§ 11-804(b) and 11-1204(b), the sections that he was charged with violating. Section 11-804(b) requires drivers to signal continuously for at least 100 feet before turning in a business or residential district. Section 11-1204(b) requires drivers to stop at a clearly marked stop sign before entering an intersection indicated by a stop sign. A violation of one of the Illinois rules of the road enacted in these sections constitutes a petty offense. § 6-601.

---

[23] No exception to *Rooker-Feldman* allows a federal district court to sit in review of a state-court decision when a party alleges that the judges who decided his issues were biased against him. Neither the Seventh Circuit nor the U.S. Supreme Court have created such an exception. At least one sister circuit, the Sixth Circuit, has explicitly refused to recognize one:

> [The Plaintiffs] argue, the *Rooker-Feldman* doctrine should not apply because decisions rendered by biased judges should be considered void. In essence, the Plaintiffs ask us to carve out an exception to the *Rooker-Feldman* doctrine and permit the district courts to sit in review of state court judgments and orders when a party alleges that the judges who decided her issue were biased against her. We decline to do so, for in such a case, the party's recourse is the same as that of all those parties who were unable to file a claim in federal district court on account of the *Rooker–Feldman* doctrine, to petition for a writ of certiorari from the United States Supreme Court.

*Gilbert v. Ferry*, 401 F.3d 411, 417 n.5 (6th Cir.), *on reh'g in part*, 413 F.3d 578 (6th Cir. 2005).

Mr. Willliams asserts that these Illinois rules of the road substantially burden his religious exercise because they are "unrighteous and evil statutes." ACC 13. He describes himself as "a member of the Body of Christ," ACC 12, which the Court understands to mean that he follows the Bible. Mr. Williams quotes several passages of the Bible, including "Strive not with a man without cause, if he has done thee no harm," "Love does no harm to a neighbor, therefore love is the fulfillment of the law," and "Woe to those who enact unjust statutes and issue oppressive decrees, to deprive the poor of fair treatment and withhold justice from the oppressed of My people." *Id*. at 13-14 (quoting Proverbs 3:30; Romans 13:9-10; Isaiah 10:1-2). Mr. Williams alleges that the specified sections of the Illinois Vehicle Code are contrary to the Bible's teachings and, thus, his religious belief. *See id*. at 14 ("These unjust statutes . . . are contrary to his law of love."); *id*. at 49 ("Plaintiff sincerely believe that the governments [sic] statutes violates [sic] his core religious belief of do unto others as you would have others do unto you and do no harm to your neighbors."). He seeks injunctive relief and damages against all defendants under the RFRA. The RFRA only applies to the federal government, not to state or local governments. *See City of Boerne v. Flores*, 521 U.S. 507, 529-537 (1997) (holding RFRA unconstitutional as applied to the states). Therefore, the Court reconstrues Mr. Williams' theory of relief as a § 1983 theory based on a deprivation of his rights under the Free Exercise Clause of the First Amendment to the U.S. Constitution.

To the extent that Mr. Williams challenges the Illinois rules of the road themselves, his theory is frivolous; traffic laws are neutral laws of general application that do not penalize Mr. Williams for his religious beliefs. "[T]he Free Exercise Clause [does] not entitle [ ] church members to a special dispensation from the general criminal laws on account of their religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017). The Free Exercise

39

Clause protects Mr. Williams' right to go to church, but not his right to speed in order to get there on time.

To the extent that Mr. Williams asserts that "having to pay the government" is what burdens his religious exercise, his claim is barred by the *Rooker-Feldman* doctrine or he lacks standing. He was fined because of his conviction, so his injury is caused by his conviction. This makes his injury inextricably intertwined with his conviction, satisfying the first requirement for applying the *Rooker-Feldman* doctrine. In addition, Mr. Williams had a reasonable opportunity to raise the issue of religious liberty in state court, satisfying the second requirement. During his state-court proceedings, he could have invoked the Illinois Religious Freedom Restoration Act ("Illinois RFRA"), 775 ILCS 35/5, to challenge the Illinois Vehicle Code. *See, e.g., Diggs v. Snyder*, 775 N.E.2d 40 (2002) (Illinois RFRA case). Therefore, the *Rooker Feldman* doctrine strips this Court of jurisdiction over Mr. Williams' claim to the extent that he seeks damages. And as noted above in discussing *O'Shea,* the prospect that Mr. Williams may be ticketed for violations of valid traffic ordinances in the future provides no basis for standing to seek injunctive relief.

In sum, Claim VIII—that traffic laws burden Mr. Williams' exercise of religious freedom—is frivolous and/or barred by the *Rooker-Feldman* doctrine and lack of standing. For these reasons, Claim VIII warrants dismissal.

## IX.    Illinois Driver Licensing Law

Section 6-101(a)-(b) of the Illinois Vehicle Code requires that motor vehicle drivers have a valid license or permit. As defined in § 1-146, the term "motor vehicle" means "[e]very vehicle which is self-propelled and every vehicle which is propelled by electric power obtained from overhead trolley wires, but not operated upon rails, except for vehicles moved solely by human power, motorized wheelchairs, low-speed electric bicycles, and low-speed gas bicycles." Driving without a license or permit constitutes a petty offense or misdemeanor. § 6-601(c). Mr. Williams

alleges that, through its driver licensing law, "Illinois has [ ] impeded the ability of Plaintiff to travel without a license without being fined." ACC 51. Based on these allegations, Mr. Williams sues the State of Illinois, J.B. Pritzker, and Kwame Raoul under § 1983 for a violation of his rights. He seeks damages and injunctive relief. *Id*. at 50.

Claim IX consists of a challenge to a state law unconnected to Mr. Williams' state-court proceedings. Therefore, this claim is not barred by the *Rooker-Feldman* doctrine. In addition, at this stage, the Court does not conclude that Mr. Williams lacks standing. He has presumably obtained, and paid for, an Illinois driver's license in the past. He has not specifically alleged that he would be prosecuted for failing to renew his license when it next expires, but at this stage, the Court is willing to infer that such prosecution is likely. In addition, withdrawal from further driving until a test case could be taken through the Illinois courts would burden Mr. Williams' ability to perform the ordinary tasks of daily life. *See Toomer v. Witsell*, 334 U.S. 385, 391 (1948); *Wooley v. Maynard*, 430 U.S. 705, 712 (1977). Therefore, the Court is sufficiently satisfied at this stage that it has subject-matter jurisdiction over Claim IX, and it proceeds to consider other issues under § 1915(e)(2).

To the extent that Mr. Williams seeks damages, the defendants are immune. Mr. Williams sues J.B. Pritzker and Kwame Raoul "in their respective official capacities" and the State of Illinois. ACC 51. The Eleventh Amendment bars actions in federal court against a state or state officials acting in their official capacities unless one of three exceptions applies: consent,[24] congressional abrogation, or the *Ex parte Young* doctrine. *Peirick v. Indiana Univ.-Purdue Univ.*

---

[24] The Illinois State Lawsuit Immunity Act, 745 ILCS 5/1, provides that, "[e]xcept as provided in the Illinois Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the State of Illinois shall not be made a defendant or party in any court." Section 1.5 only applies to state employees.

*Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007). The first two exceptions do not apply here, and the *Ex parte Young* doctrine only applies to suits for injunctive relief. *See Ex parte Young*, 209 U.S. 123, 159-160 (1908). Thus, to the extent that Mr. Williams seeks damages, the third exception does not apply, and his claim is barred by the Eleventh Amendment.

To the extent that Mr. Williams seeks injunctive relief, the *Ex Parte Young* doctrine must apply for his claim to escape the Eleventh-Amendment bar. This doctrine applies to suits to enjoin state officers from violations of federal law. *See id*. At this point, to clarify Mr. Williams' claim and his request for relief, the Court summarizes his theory. Mr. Williams argues that the definition of "motor vehicle" in the Illinois Vehicle Code is preempted by a narrower definition of that term in Title 18 of the United States Code, which deals with federal crimes and criminal procedure; § 31(a)(6) defines "motor vehicle" to exclude vehicles used for noncommercial purposes, whereas the Illinois driver licensing law, Illinois Vehicle Code § 1-146, includes such vehicles.[25] Mr. Williams asserts that 18 U.S.C. § 31(a)(6) confers a "right to travel when not engaged in commercial business," which, according to Mr. Williams, the Illinois driver licensing law violates. ACC 15-16, 51. Based on this construction of Mr. Williams' theory, the Court assumes that the *Ex parte Young* doctrine applies, meaning that the Court can provide equitable relief against enforcement of the Illinois driver licensing law without running afoul of the Eleventh Amendment.

Even so, Mr. Williams' claim does not survive screening because his legal theory is frivolous. As an initial matter, he asserts a claim under § 1983 for a deprivation of his rights under the Supremacy Clause, but "the Supremacy Clause is not the 'source of any federal rights.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (quoting *Golden State Transit*

---

[25] Under § 31(a)(6), "[t]he term 'motor vehicle' means every description of carriage or other contrivance propelled or drawn by mechanical power and used for commercial purposes on the highways in the transportation of passengers, passengers and property, or property or cargo."

*Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Nor is Title 18 a source of any general right to travel. The Supreme Court has held that "[i]n the absence of national legislation covering the subject, a state may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles . . . . And to this end it may require the registration of such vehicles and the licensing of their drivers." *Hendrick v. State of Maryland*, 235 U.S. 610, 622 (1915). Title 18 does not cover the entire subject of motor vehicle regulation by a longshot. Sections of this Title criminalize select and narrowly defined conduct; it is a crime, for example, to destroy motor vehicles (§ 33), commit a drive-by-shooting in certain circumstances (§ 36), and knowingly fail to stop for inspection when directed to do so by an authorized employee of the Federal Motor Carrier Safety Administration of the Department of Transportation (§ 40). Neither these provisions nor any others address licensing fees required by states, much less preempt the Illinois Vehicle Code.

To the extent that Mr. Williams seeks damages, Claim IX fails screening based on defendant immunity. To the extent that he seeks injunctive relief, this claim is legally frivolous. Therefore, Claim IX warrants dismissal with prejudice.

## X.    Illinois FOIA Request

On January 1, 2020, Mr. Williams submitted an Illinois FOIA request to the City of Aurora "for documents relating to the Gang Assessment Database and any other databases in which gang allegation information is kept." ACC 47. In a telephone conversation with a city employee on January 23, 2020, he verbally narrowed the request. *Id*. Nonetheless, the City refused his request based on two exemptions written into the statute. *Id*. Mr. Williams asserts that the "[e]xemptions do not apply because [he] requested that names and other personal information be omitted from responsive documents." *Id*. at 73. In the ACC, Mr. Williams sues the City of Aurora for a violation

of the Illinois FOIA. He seeks damages and injunctive relief "requiring the City to comply with FOIA by producing all requested documents without further delay." *Id*. at 48; *see also id*. at 73.

Supplemental jurisdiction is the only way for Mr. Williams to bring his Illinois FOIA claim in this Court. Claim X arises entirely under state law, so original jurisdiction is lacking. Mr. Williams is an Illinois citizen, so diversity jurisdiction is also lacking. Therefore, for the Court to have subject-matter jurisdiction over Claim X, the Court must have supplemental jurisdiction. For the Court to have supplemental jurisdiction, Claim X must be "so related to claims in the action within [the Court's] original jurisdiction that [Claim X] form[s] part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). The City's response to Mr. Williams' efforts to obtain municipal records is independent of his claims about the validity of the laws and procedures to which the documents he seeks pertain and his claim for denial of access to those records therefore does not satisfy the criteria for supplemental jurisdiction. And even if the Court had supplemental jurisdiction over this claim, it would decline to exercise it.

The defendants in the Second Case previously argued that "[t]he proper venue for [Mr. Williams' Illinois FOIA claim] is with the Illinois Attorney General's Office or the Circuit Court of Kane County." Mem. Supp. Mot. Dismiss 1st Am. Compl. 5, No. 21 C 3489, ECF No. 37. This Court agrees. Claim X warrants dismissal without prejudice.

\*     \*     \*

In sum, all claims in the ACC warrant dismissal. Accordingly, the Court grants Mr. Williams' motion for leave to amend, but then it dismisses the ACC. Because Mr. Williams has had more than enough opportunity to set forth in full his grievances against the defendants, and most of those grievances are legally frivolous, the dismissals are without leave to amend. *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022). Claim I is dismissed with prejudice as frivolous

and for failure to state a claim, to the extent that Mr. Williams seeks damages (to the extent that he seeks injunctive relief, the dismissal is without prejudice for lack of subject-matter jurisdiction). Claims II-VII are dismissed without prejudice for lack of subject-matter jurisdiction. Claim VIII is dismissed with prejudice as frivolous, to the extent that Mr. Williams challenges the Illinois rules of the road (to the extent that he challenges having to pay a fine, the dismissal is without prejudice for lack of subject-matter jurisdiction). Claim IX is dismissed with prejudice based on defendant immunity and as frivolous. The Court declines to exercise supplemental jurisdiction over Claim X, which is therefore dismissed without prejudice. Judgment will be entered for the defendants, and the case will be terminated. Absent a basis for extension, any notice of appeal must be filed on this Court's docket within thirty days. Fed. R. App. P. 4(a)(1)(A).

Date: March 20, 2024

John J. Tharp, Jr.
United States District Judge